Filed 3/11/14  P. v. Moreno CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058644 |
| v. | (Super.Ct.No. SWF1200878) |
| ANTONIO MORENO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael J. Rushton, Judge.  Affirmed.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

## INTRODUCTION

On August 22, 2012, an information charged defendant and appellant Antonio Moreno with three counts of making criminal threats under Penal Code[1] section 422 (counts 1, 2, 7); three counts of assault with a semiautomatic weapon under section 245, subdivision (b) (counts 3, 4, 5); and dissuading a witness under section 136.1, subdivision (c)(1) (count 6). The information also alleged as to the assault charges (counts 3, 4, 5), defendant personally used a firearm within the meaning of sections 12022.5, subdivision (a), and 1192.7, subdivision (c)(8).[2]

On March 8, 2013, a jury convicted defendant of one count of making criminal threats under section 422 (count 2), and one count of dissuading a witness under section 136.1 (count 6). The jury was unable to reach a verdict on the remaining counts and a mistrial was declared on those counts. On April 5, 2013, over the prosecution's objection, the court dismissed the remaining counts under section 1385.

On April 26, 2013, the trial court denied defendant's motion to reduce count 2 to a misdemeanor under section 17, subdivision (b). Thereafter, the trial court also denied probation and sentenced defendant to two years eight months in state prison. The court awarded defendant 376 days of actual presentence custody credit, and 376 days of presentence custody credit under section 4019, for a total of 752 days.

---

[1] All further statutory references are to the Penal Code, unless otherwise specified.

[2] On February 26, 2013, an amended information was filed correcting the alleged offense date for counts 6 and 7.

Defendant filed a timely notice of appeal.

## STATEMENT OF FACTS

### A. *Prosecution Case*

On September 4, 2011, Jose Zaragoza and his brother-in-law, Jose Alvaro Escatel-Robles (Alvaro), were spending the holiday weekend with Alvaro's cousin, Francisco Escatel. At the time, Escatel lived at a ranch owned by Danny Ruth. Alvaro and Escatel saw each other fairly often; Escatel knew Zaragoza through Alvaro. Escatel estimated that each man consumed about two beers before they went to another ranch that sold milk. There, they drank "pajaretes," a beverage made with alcohol and milk. Zaragoza testified that he had about three parajetes, along with five or six beers, at the milk ranch. Alvaro had "a little bit" of alcohol with milk, while Escatel stated that he had two pajaretes. They stayed at the milk ranch for about two to four hours.

While they three men were at the milk ranch, they saw defendant and two of his friends. The three men had seen defendant and his friends earlier that day, when defendant had returned a boat to Escatel's ranch. Escatel knew defendant through a mutual friend, Narciso Sorira. Zaragoza and Alvaro also knew defendant. At the ranch, the men all drank together and socialized.

At some point, Zaragoza, Escatel and defendant began to argue. Zaragoza admitted being involved in the argument but denied knowing how it started. Escatel denied being involved in the argument but admitted getting angry. He heard defendant making offensive comments to Zaragoza and believed defendant and his friends were

making fun of Zaragoza. The argument escalated but it did not get physical. Zaragoza testified that he and his friends left first; Escatel recalled that defendant and his friends left first.

Zaragoza, Escatel, and Alvaro went back to Escatel's ranch. Though Zaragoza denied drinking any more alcohol, both Escatel and Alvaro stated that the three men continued to drink beer on Escatel's porch. They sat on the porch for several hours talking about the argument at the milk ranch.

While they were sitting on the porch, Zaragoza saw Escatel texting someone. Escatel denied texting anyone, but admitted on the stand that he had called Narcisco Sorira. Escatel stated that he was still mad about the earlier incident; that defendant and his friends insulted Zaragoza and then left without resolving the situation. Escatel told Sorira that he was mad and that if defendant "ha[d] any balls," he would "take care of things" with Zaragoza. Although Escatel had called Sorira, he was aware that defendant could hear Escatel since Sorira had put him on the speaker. Escatel, however, claimed that he was not challenging anyone and did not expect defendant to come over.

Approximately 10 minutes after Escatel ended the call, a car drove up to the porch. Alvaro and Escatel saw defendant get out of the driver's seat. Defendant's two friends from earlier that day—Narcisco and Sorira—were with defendant. Zaragoza believed that defendant was angry and knew defendant "was there to fight."

Zaragoza, Alvaro and Escatel testified that defendant was wearing gloves and held a handgun in his right hand. They heard him cursing and yelling, and threatening to kill

4

Zaragoza and Escatel.  Defendant pointed the gun at each of the men.  Escatel grabbed the gun and held it for three or four minutes, while he and defendant struggled.  Though Escatel did not take the gun away from defendant, defendant ultimately left.  Both Alvaro and Zaragoza testified that defendant and his friends left when a second car pulled up to the gate of the ranch and a woman got out.  Escatel did not notice a second car before defendant left.

After defendant left, Escatel called the police, who arrived about five or 10 minutes after the call.  Though Escatel stated that he did not feel the effects of alcohol when the police arrived, Riverside County Deputy Sheriff Joshua Carrasco, who responded to the residence, testified that he noticed objective signs of intoxication in all three men.  Zaragoza had fallen asleep in a chair by the time Deputy Carrasco arrived, while Escatel admitted to drinking all day.

Deputy Carrasco arrived at the residence just before 1:00 a.m. in response to a call for assault with a deadly weapon.  He tried to speak with each of the men on the porch.  However, neither he nor his partner spoke Spanish.  The deputy admitted that he had difficulty communicating with Alvaro and Zaragoza as they tried to explain what had transpired.  The deputy was able to speak in English with Escatel, who seemed to understand the deputy and was responsive to his questioning.  Escatel identified defendant as a suspect in the incident.

5

Based on the information received, Deputy Carrasco went to another residence in search of defendant. With the permission of Lola Gutierrez, the property owner, the deputy searched the residence; he was unable to find either defendant or a weapon.

Deputy Carrosco eventually contacted defendant on September 5, 2011, in the afternoon, after obtaining his telephone number from one of the three men on the porch. Defendant identified himself and gave a statement to the deputy. Defendant stated that he knew Escatel and had seen him earlier in the day on September 4, 2013, when he visited with Escatel and some friends. He told Deputy Carrasco that there had been an argument at the milk ranch where they had been drinking. Escatel and his friends left the milk ranch. Later, Escatel called Sorira to resolve things. Defendant admitted that things got heated. After the call, defendant and Sorira went over to Escatel's house. Defendant denied ever having a gun that night or even owning a gun. He stated that no one had a gun that night.

Deputy Carrasco testified that none of the men at Escatel's ranch told him about a telephone call being made to Sorira. There were also no details about the description of the gun.

Following the incident, Escatel moved from the ranch and moved in with Zaragoza and Alvaro for three months. A few weeks after the incident, Escatel received a document in the mail. At the time, he was unable to read the document and was not living with anyone who could read the document. Although Escatel denied maintaining his friendship with Sorira after the incident, Escatel called Sorira when he received the

6

document because he did not want there to be any problems. Escatel was able to ascertain that the document related to defendant because defendant's name was on the document.

Defendant went to Escatel's house to read the document. After reading it, defendant told Escatel to sign the paper, explaining that it was about the incident and that "nothing was going to happen." Defendant stated that after he signed the document, defendant took the document with him.

In January 2012, after defendant told Escatel to sign the document, defendant called Escatel and told him he needed to go to court. Defendant explained that Escatel had to say nothing was true and that nothing had happened on September 4. Defendant and Sorira picked up Escatel and took him to court. On the way to court, defendant threatened to kill Escatel or do something to his family if Escatel "didn't go on [defendant's] side." Escatel interpreted this as a threat and felt that he had to lie to protect himself and his family.

Once at court, Escatel went to an office where he was interviewed by Roger LeMasters, an investigator with the Public Defender's office. At the time, Escatel did not know who the investigator worked for. Escatel told LeMasters that nothing had happened. Escatel did not let LeMasters know that defendant had pointed a gun at him and threatened him. Escatel felt bad as he left the office but lied because of defendant's threats. Escatel informed defendant that he had lied to the investigator; Escatel did not see defendant again.

7

LeMasters testified for the prosecution. He had been the investigator for defendant's previous attorney and worked on defendant's case. On January 25, 2012, he went to defendant's house and told defendant that he wanted to interview both Escatel and Sorira. Though both men came to defendant's house, LeMasters was unable to conduct the interviews because of the language barrier. He set up a future interview date of January 30 for Escatel and asked defendant to tell Escatel about the interview. LeMasters explained that this was because he had no way of contacting Escatel. He did not recall specifically instructing defendant to bring Escatel to the office for an interview. However, it was his practice that, if a victim of a crime does not contact him and appears to be amenable to going with the defendant, he would ask a defendant to bring the victim to the office. In this case, he testified that he did not know whether Escatel was amenable to coming with defendant.

*B. Defense Case*

The defense called two witnesses, Danny Mentze and Rebecca Netzer; they each testified that Escatel had offered them $5,000 to get defendant deported. Mentze stated that he did not know how Escatel would get the money; he did not take Escatel seriously. Netzer explained that Escatel offered her money to call immigration and have defendant deported. Escatel told Netzer that he had a pending case and the money would come from that settlement. When Netzer asked Escatel why he would want defendant deported, Escatel said that defendant owed him an apology for the incident on September 4. If defendant did not apologize, Escatel would do something about it.

8

Netzer also saw defendant on the night of the incident when they went for a late dinner. She did not see defendant with a gun and she denied that defendant came to her house and threw a gun in her property. She testified that defendant and Escatel continued to see each other after the incident. Netzer stated that Escatel needed defendant's help to make money and that defendant would help him. Escatel and defendant remained friends until everything "erupted in court, in the court system."

Lola Gutierrez, defendant's landlady and employer, testified. She had known defendant for 14 years and was familiar with Escatel. On September 4, 2011, she was with defendant at the milk ranch. She, however, did not see Sorira there. She was also present when Escatel called Sorira later that night, but did not understand what was being said, as the men spoke in Spanish. Gutierrez had cleaned defendant's room and never found any guns. When she allowed law enforcement to search defendant's room after the incident, she knew they did not find any guns.

Gutierrez stated Escatel continued to come over and spend time with defendant even after the incident. She also accompanied defendant when he drove Escatel home after the interview with LeMasters. During the car ride, Escatel repeatedly apologized to defendant and denied making any phone call. Escatel said he was too drunk to make a phone call and told defendant his friend had called Sorira.

Sorira testified that he knew all the men involved in the incident. In particular, he had known Escatel since they were young. Around the time of the incident, he saw Escatel every day for work.

9

On September 4, 2011, Sorira went with defendant to drop off a boat at Escatel's house. He remained there for about 15 to 20 minutes before leaving. After dropping the boat off, defendant took Sorira home and left. Sorira did not know where defendant went. He denied going to the milk ranch with defendant. He was with defendant again later that night when Escatel called. Escatel told Sorira to tell defendant, "[I]f he has big balls, my friend says for him to come over." Defendant, who heard Escatel's message, wanted to go over to fix things. Sorira and his brother, Miguel, accompanied defendant to keep things calm.

When they arrived at Escatel's ranch, Sorira said there were five men on the porch. He saw defendant grab Escatel when they were talking, at which point Sorira told defendant to calm down. Defendant did not have a gun.

Sorira stated that Escatel and defendant continued talking after the incident; Sorira, however, no longer talked to Escatel. Sorira was with defendant when he drove Escatel to his interview with LeMasters. Sorira did not hear defendant threaten Escatel. In fact, they did not talk about the case at all.

Defendant took the stand on his own behalf. He explained that he knew Escatel through Sorira and had known Escatel for about six or seven months prior to the incident. He characterized their relationship as more of a work relationship rather than a personal one. Defendant described his relationship with Sorira the same way.

On September 4, 2011, defendant first saw Escatel when he returned a boat to Escatel's house. At that time, he met Zaragoza and Alvaro for the first time. Though

10

they invited defendant to stay, he only stayed for 10 to 15 minutes. He then took Sorira home and went back to Gutierrez's house.

Defendant saw Escatel and his friends again at the milk ranch. Gutierrez was with defendant. Defendant had a few beers with Escatel and his friends, who were already drinking when defendant arrived. He stayed at the milk ranch for 45 minutes to an hour. While there, he got into an argument with Zaragoza, which he described as starting out as a joke. Defendant admitted that he made fun of Zaragoza's job because he believed Zaragoza was lying about how much money he made.

When Zaragoza began to get upset with defendant, Escatel ,who was "quite drunk," jumped into the argument. Defendant did not think Escatel knew what was going on, but Escatel was aggressive and said defendant should not speak like that to Zaragoza. The argument continued for five to 10 minutes before defendant left. Defendant realized that Escatel and his friends took defendant's comments seriously rather than as a joke.

Later that night, defendant went to Sorira's house, where he stayed for about an hour. While he was there, Escatel called. Escatel told Sorira to tell defendant "if he has balls to come and tell my friend what he was telling him at the other ranch this afternoon." Defendant acknowledged that the call made him upset but denied being angry. He decided to go to Escatel's house to make things clear to avoid future problems.

At Escatel's ranch, defendant saw Escatel, Zaragoza and a third man defendant did not know. The third man told Escatel to leave and threatened to "put [defendant] down" if he did not. Defendant did not know who he was and did not see him testify at any

11

court hearing.  Defendant admitted that he argued with Escatel over the phone call, which Escatel denied making.  Defendant told Escatel not to lie.  Escatel never admitted to making the phone call that night.

Once defendant realized that the argument "wasn't going anywhere," he decided to leave.  At that point, Escatel grabbed defendant's hand and said he wanted to talk. Defendant left instead.  Prior to this incident, defendant had no problems with Escatel.

The day after the incident, defendant spoke to Deputy Carrasco.  Defendant stated that he had met up with Escatel and two of his friends at the milk ranch, where they drank together.  Defendant believed Escatel and his friends were intoxicated.  Defendant also told him about Escatel's phone call and the argument, though he admitted that he did not give the deputy the entire story.  Defendant also denied owning any firearms with the exception of a pellet gun.

Approximately one month after the incident, Escatel began calling defendant again.  Defendant eventually discovered that he would have to go to court for the incident.  At that time, defendant had a different attorney; investigator LeMasters worked with him.  LeMasters told defendant he could not find Escatel.  Defendant informed LeMasters that he had been in touch with Escatel.  At LeMaster's request, defendant asked Escatel to meet with LeMasters.  Escatel asked for a ride from defendant and defendant complied.  Defendant denied threatening Escatel on the car ride to the office. The only remarks defendant made was for Escatel to tell the truth.

Defendant and Escatel continued to talk several times after the interview. Their last conversation occurred on April 9, 2012. Escatel called defendant and told him that the district attorney's office told Escatel that if he was lying, changed his story, or did not come to court, they would put Escatel in jail.

At trial, defendant was surprised that Escatel was accusing defendant of the charged crimes. Although they were not close friends, defendant believed that he and Escatel were friends. Around the time of the incident, defendant saw Escatel four or five times a month for work.

Defendant stated that he had known Escatel to lie and repeatedly stated that, had he known Escatel was a witness, he would not have interacted with Escatel as much. When defendant first realized criminal charges had been filed against him, he did not initially realize that Escatel was a witness. Escatel told defendant that the neighbors called the police and denied that he had anything to do with the phone call. Defendant did not know that Escatel would be the alleged victim. Defendant testified that he did not know if Escatel had actually changed his story because he was never told exactly what Escatel had stated.

Defendant repeatedly denied threatening anyone at Escatel's ranch or during the car ride to LeMaster's office. Defendant also did not think Escatel was ever intimidated by anything defendant had said or done since Escatel continued to call defendant and interact with him. Defendant also denied ever owning a gun.

13

**ANALYSIS**

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738, setting forth a statement of the case, a summary of the facts and potential arguable issues, and requesting this court to undertake a review of the entire record.

We offered defendant an opportunity to file a personal supplemental brief, but he has not done so. Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have conducted an independent review of the record and find no arguable issues.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

MILLER
J.